In the

# United States Court of Appeals
## For the Seventh Circuit

─────────────

No. 25-1483

JOLIET AVIONICS, INC.,

*Plaintiff-Appellant,*

*v.*

CITY OF AURORA, ILLINOIS,

*Defendant-Appellee.*

─────────────

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:19-cv-08507 — **Thomas M. Durkin**, *Judge.*

─────────────

ARGUED APRIL 14, 2026 — DECIDED JULY 29, 2026

─────────────

Before HAMILTON, KIRSCH, and KOLAR, *Circuit Judges.*

HAMILTON, *Circuit Judge.* Plaintiff Joliet Avionics, Inc. believes that defendant City of Aurora gave plaintiff's competitor a better contract and excused its competitor from complying with certain city requirements. Plaintiff sued the City, claiming an equal protection violation under a "class-of-one" theory and breach of contract. The district court granted summary judgment to the City on both counts. We affirm.

I.  *Factual Background & Procedural History*

Fixed-base operators are businesses at airports that provide essential services such as aircraft maintenance, flight training, and avionics installation and repair. Federal Aviation Administration, Advisory Circular No. 150/5190-8, Minimum Standards for Commercial Aeronautical Activities § A.1.9 (2023), https://www.faa.gov/documentLibrary/media/Advisory_Circular/AC-150-5190-8-minimum-standards.pdf [https://perma.cc/3JQW-MM5G].  Defendant City of Aurora is the airport sponsor for the Aurora Municipal Airport in Sugar Grove, Illinois. An airport sponsor is a public agency or private owner of a public-use airport that receives financial assistance from the Federal Aviation Administration. As airport sponsor, the City leased parts of the airport property to two fixed-base operators—Carver Aero (which purchased a previous tenant, Lumanair) and plaintiff Joliet Avionics, Inc.—which operate their businesses on the premises and provide services to the Aurora airport.

Upon recommendation of the Federal Aviation Administration, the City maintains a policy, which we call the Minimum Standards policy, to govern commercial activities and tenants at the airport. Under the policy, any lessee who wishes to install fuel storage tanks or fuel farms must build them above ground and must provide proof of environmental and liability insurance. In turn, the policy says, the City's "intent and duty [is] … to encourage and promote free enterprise" and "to protect its tenants from unreasonable or unfair competition." Further, to continue receiving federal assistance, the City is supposed to adhere to certain conditions known as "grant assurances." One grant assurance relevant in this case requires all fixed-base operators at the

airport to "be subject to the same rates, fees, rentals, and other charges as are uniformly applicable to all other fixed-base operators making the same or similar uses of such airport and utilizing the same or similar facilities."

At the core of this dispute are the different leases that plaintiff and Lumanair/Carver entered with the City at different times and for different properties. So it's not a surprise that the leases are quite different. We start with plaintiff's. In 2007, plaintiff entered a twenty-year lease with the City with options to renew for two five-year periods. The lease covered three hangars, the underlying real estate, and a parcel of land on which plaintiff would construct and operate a fuel farm. To help finance the construction of the fuel farm and other improvements, the City agreed to issue bonds for capital improvements and to have plaintiff make the principal and interest payments on the bonds in lieu of paying ground rent. Plaintiff fell behind on its payments. Plaintiff and the City amended the lease in 2015 to discharge some of plaintiff's debts.

Carver's agreements were different in material respects. Two facts help provide important context to Lumanair's and Carver's contractual relationships with the City. First, Lumanair, which was later purchased by Carver, had operated at the airport since 1982. During that time, it had negotiated multiple leases with the City. Second, despite the requirement in the Minimum Standards policy, Lumanair never built an above-ground fuel farm. It continued to maintain its underground fuel tanks even when faced with eviction.

Against this backdrop, the City and Lumanair in 2020 entered a lease for a five-year term with renewal options. Under

the terms of that lease, Lumanair did not have to pay ground rent for the first five years and, if renewed, for another two years. For its part, Lumanair promised to undertake at least $1.2 million in capital improvements and, by August 2022, to complete the construction of an above-ground fuel farm. In 2022, one year after Lumanair was purchased by Carver, the City and Carver entered a new lease. By that time, the above-ground fuel farm still had not been built. Under the new lease, Carver was not required to pay ground rent for the first 20 years as long as it built a compliant fuel farm and met all other requirements under the Minimum Standards policy by July 1, 2024. The lease also required Carver to invest at least $10 million in the premises with investments made at regular intervals. In lieu of environmental insurance as required under the Minimum Standards policy, Carver promised to enter into an environmental indemnity agreement with the City.

As plaintiff sees things, Lumanair's and Carver's leases allegedly contained more favorable terms, in violation of the grant assurance's requirement for similarly situated fixed-base operators to be "subject to the same rates, fees, rentals, and other charges." Further, from plaintiff's perspective, the City also violated the Minimum Standards policy by not strictly enforcing the fuel-farm or insurance requirements with Lumanair or Carver.

In 2019, plaintiff filed this lawsuit in state court against the City and Lumanair. The City later removed the suit to federal court, and plaintiff amended its complaint to drop the claims against Lumanair. The amended complaint alleged claims against the City for breach of contract and equal protection "class-of-one" discrimination. After discovery, both parties moved for summary judgment. In 2024, the district court

granted summary judgment to the City on both claims, denied summary judgment to plaintiff, and entered judgment for the City. *Joliet Avionics, Inc. v. City of Aurora*, No. 19 C 8507, 2024 WL 4753669 (N.D. Ill. Nov. 8, 2024), reconsideration denied, 2025 WL 893588 (N.D. Ill. Feb. 24, 2025). Plaintiff has appealed.

The district court had federal-question jurisdiction over the equal protection claim and supplemental jurisdiction over the breach-of-contract claim. 28 U.S.C. §§ 1331, 1367. We have jurisdiction to hear this appeal under § 1291. Illinois law controls the breach-of-contract claim. We review a district court's grant of summary judgment de novo, giving the non-moving party the benefit of reasonable inferences from the evidence and resolving conflicting evidence in its favor. *Christensen v. Weiss*, 145 F.4th 743, 748 (7th Cir. 2025). We discuss plaintiff's claims in turn, starting with equal protection.

II. *Class-of-One Theory*

The Equal Protection Clause of the Fourteenth Amendment protects people from unequal and discriminatory treatment by the government. *Swanson v. City of Chetek*, 719 F.3d 780, 783 (7th Cir. 2013). It guards against discrimination on invidious grounds such as race and sex, as well as against arbitrary discrimination "against even one person." *Hanes v. Zurick*, 578 F.3d 491, 494 (7th Cir. 2009). This kind of claim—a so-called "class-of-one" claim—requires a plaintiff to show that she was "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); accord, e.g., *Indiana Land Trust #3082 v. Hammond Redevelopment Comm'n*, 107 F.4th 693, 698 (7th Cir. 2024). Class-of-one liability, however, does not reach every

arbitrary government decision. The Supreme Court has held that class-of-one claims have no place in public-employment disputes, where decisions are typically "subjective and individualized, resting on a wide array of factors that are difficult to articulate and quantify." *Engquist v. Oregon Dep't of Agriculture*, 553 U.S. 591, 604 (2008).

The district court concluded, and we agree, that a class-of-one theory is also a poor fit for plaintiff's disputes with the City. See *Joliet Avionics*, 2024 WL 4753669, at *5–6. Plaintiff argues in essence that the City gave it a worse contract than it gave Lumanair and Carver. As a practical matter, we think it implausible and infeasible that plaintiff's interpretations of the grant assurance and Minimum Standards policy are correct. The Constitution does not require the City to have identical contracts with each fixed-base operator. Negotiating over lease terms, bargaining over finances, and making decisions about how to respond to a counter-party's defective contract performance all involve discretionary and individualized decision-making similar to the decisions that the Supreme Court held in *Engquist* cannot give rise to class-of-one liability.

Strictly speaking, *Engquist*'s holding was focused on public employment, but we have not treated that limit as dispositive. See *Geinosky v. City of Chicago*, 675 F.3d 743, 747 (7th Cir. 2012) ("The appropriate limiting principle must be tailored to the type of government action at issue."); *Hanes*, 578 F.3d at 495 (interpreting *Engquist* to teach that "context matters" when deciding whether the class-of-one theory is available to challenge a government decision). We have relied on *Engquist*'s reasoning in deciding whether to recognize class-of-one claims in other contexts. Two aspects of *Engquist*'s logic figure prominently in our analysis here.

No. 25-1483                                                    7

First, as *Engquist* explained, "some forms of state action" are particularly unsuitable for class-of-one liability because they "involve discretionary decisionmaking based on a vast array of subjective, individualized assessments." 553 U.S. at 603. Discretion anticipates that some people (even one person) will almost inevitably be treated differently than others. Those differences do not violate the Equal Protection Clause where "treating like individuals differently is an accepted consequence of the discretion granted." *Id.*

Second, as we have said, *Engquist* teaches that "context matters." *Hanes*, 578 F.3d at 495. In public employment, for example, decisions are "often subjective and individualized," and "the public employer often must take into account the individual personalities and interpersonal relationships of employees in the workplace," as well as "the varied needs and interests involved" in employment. *Engquist*, 553 U.S. at 604. As the Supreme Court has recognized, "government offices could not function if every employment decision became a constitutional matter." *Connick v. Myers*, 461 U.S. 138, 143 (1983). In that setting, differential treatment is easier to understand and justify than when a government acts as a sovereign—the context in which constitutional constraints are at their apex. See *Waters v. Churchill*, 511 U.S. 661, 674 (1994) (plurality opinion) ("[C]onstitutional review of government employment decisions must rest on different principles than review of speech restraints imposed by the government as sovereign."), quoted in *Engquist*, 553 U.S. at 599.

To make these principles concrete, consider two familiar examples. As *Engquist* illustrates, a driver cannot proceed on a class-of-one claim just because he was stopped for speeding when others were speeding, too (absent differential treatment

based on a forbidden classification like race or sex). 553 U.S. at 603–04. A class-of-one challenge in such circumstances cannot proceed. "It is no proper challenge to what in its nature is a subjective, individualized decision that it was subjective and individualized." *Id.* at 604.

By contrast, class-of-one challenges may proceed "based on allegations of the irrational or malicious application of law enforcement powers." *Geinosky*, 675 F.3d at 747. In *Hanes*, the plaintiff and his neighbor were engaged in a long-running feud, but whenever police officers were called, they arrested only the plaintiff, who believed this pattern amounted to an equal protection violation. 578 F.3d at 492. The officers sought to dismiss the complaint, claiming they were entitled to exercise their discretion under *Engquist*. We affirmed the denial of dismissal, holding that a police officer who repeatedly arrested someone out of malice could be subject to an equal protection claim on a class-of-one theory. *Id.* at 496. On those alleged facts, we explained that an officer acting out of pure malice could not possibly be exercising discretion. See *id.* ("The officer motivated by malice alone … is not weighing the factors relevant to the officer's duties to the public."). Our concern in that case was amplified by the fact that the officers were exercising a core sovereign power—the power to seize another person. *Id.* at 495.

This case is quite different. Contracting presents a classic example of discretion. Contract law recognizes time and again that parties are free to strike their own bargains and to fine-tune them based on their resources and risk tolerance. If a party regrets what it negotiated, courts do not intervene on that basis alone. Real estate negotiations, especially for specialized commercial properties at different times and under

different circumstances, naturally require complicated decisions and judgment calls where some discretion is inevitable. Making apples-to-apples comparisons of these complex transactions, as plaintiff would like us to do, is difficult if not impossible.

The fact that a government is a lessor or other contracting party does not change the analysis. Before entering a lease agreement or other contract, a government too must weigh factors—budgetary, operational, and perhaps political—that can be "difficult to articulate and quantify." See *Engquist*, 553 U.S. at 604. The logic of *Engquist* thus applies with at least equal force here to government contracting. Indeed, other courts have extended *Engquist* to government-contracting disputes. See *Douglas Asphalt Co. v. Qore, Inc.*, 541 F.3d 1269, 1274 (11th Cir. 2008) (holding *Engquist* applied to government-contractor relationship); *Preschools of America (USA), Inc. v. New York City Dep't of Education*, No. 17-cv-5027, 2018 WL 4265886, at *7 (S.D.N.Y. Sept. 6, 2018), appeal dismissed, No. 18-2964 (2d Cir. Apr. 7, 2021) (same; collecting cases with similar holdings in Second Circuit); *Intralot, Inc. v. McCaffrey*, No. 11-cv-08046, 2012 WL 4361451, at *7 (N.D. Ill. Sept. 21, 2012), appeal dismissed, No. 12-3417 (7th Cir. Sept. 10, 2013) (same); see also *Planned Parenthood Ass'n of Utah v. Herbert*, 828 F.3d 1245, 1256–57 (10th Cir. 2016) (noting that *Douglas Asphalt* presented a "relatively strong case" for extending *Engquist* to government-contracting disputes but declining to resolve issue "at this very early stage of the litigation," appeal of denial of preliminary injunction).

Plaintiff attempts to reframe the City's actions. According to plaintiff, the City enacted the Minimum Standards policy via its home-rule authority, so, the argument goes, the City's

enforcement of its policy is a sovereign act. Further, plaintiff says the City now appears to be selectively enforcing the policy because, among other things, it allowed Lumanair and Carver to go for some time without an above-ground fuel farm. On this logic, the City is not a proprietor, a landlord, or a lessor, but a sovereign.

This telling of events is not persuasive. The airport is a commercial enterprise that the City owns and operates. Lumanair's and Carver's leases require them to abide by the Minimum Standard policy. The fact that the Minimum Standards policy was enacted through the City's home-rule authority does not transform the City's actions as an airport sponsor and lessor into actions of a sovereign. When an airport tenant breaches the policy and/or its lease, the City's response under the contract is not an exercise of sovereign power at all but an exercise of rights under a contract.

At most, even if we assume a breach of a legal duty by plaintiff's competitor, the City may act as every injured party to a contract does when faced with a potential breach. It selects a remedy or other course of action from a menu of options. See Restatement (Second) of Contracts § 378 (A.L.I. 1981) (recognizing that a party may elect among an array of available legal remedies). It is common of course for an injured party to sue for damages. *Evergreen Square of Cudahy v. Wisconsin Housing & Economic Development Auth.*, 848 F.3d 822, 832–33 (7th Cir. 2017); see also Restatement (Second) of Contracts § 346, comment a ("Every breach of contract gives the injured party a right to damages against the party in breach …."). But a victim of a breach may also choose to excuse or waive any delays or defects in performance. In such a case, it would not bring a suit or seek a legal remedy at all. E.g., *Asset*

*Recovery Contracting, LLC v. Walsh Construction Co. of Illinois*, 2012 IL App (1st) 101226, ¶ 76, 980 N.E.2d 708, 727; *Omni Partners v. Down*, 246 Ill. App. 3d 57, 63, 614 N.E.2d 1342, 1346 (1993).

The record indicates that the Minimum Standards policy contemplates circumstances in which an airport sponsor may decide to delay or excuse certain requirements. Plaintiff's theory appears to be that the Equal Protection Clause requires the City to insist on strict performance of contracts with all fixed-base operators. Because plaintiff alleges the City did not do so with its competitor, plaintiff seeks to compel the City to do so through a lawsuit. That theory would have the practical effect of making plaintiff a third-party beneficiary to every one of the City's contracts with other fixed-base operators. After all, only direct third-party beneficiaries can enforce contracts to which they are not parties. *A.E.I. Music Network, Inc. v. Business Computers, Inc.*, 290 F.3d 952, 955 (7th Cir. 2002) (Illinois law). The problem for plaintiff, though, is that the contracts themselves must authorize the beneficiaries to do so. *Id.* No one argues that is the case here, and we see no basis for treating plaintiff as a third-party beneficiary of the City's lease with its competitor.

Also, of course, plaintiff's theory would cut both ways. It would mean that any one of plaintiff's competitors could require the City to enforce strictly the terms of plaintiff's own lease. And remember that plaintiff's own record is not clean. Plaintiff had racked up debt for missed payments under its 2007 lease. It's hard to believe that plaintiff would rather have had the City strictly enforce the lease's terms (whatever that might have entailed) instead of discharging some of plaintiff's debt through an out-of-court agreement. The Equal Protection

Clause should not be interpreted to limit the government's discretion as a contracting party either to negotiate terms or to determine the appropriate response to a breach. Cf. *Del Marcelle v. Brown County Corp.*, 680 F.3d 887, 902 (7th Cir. 2012) (en banc) (Easterbrook, J., concurring in judgment) ("Police need not arrest everyone who committed the same offense; selectivity is normal—and is proper, unless based on a forbidden classification such as race.").

The Supreme Court's decision in *Olech* presented a very different problem. In *Olech*, a property owner sought to have her property connected to the municipal water supply. 528 U.S. at 563. The village conditioned the grant of her request on a 33-foot easement. It had required, however, only a 15-foot easement from other similarly situated property owners. The Court held that the plaintiff's complaint adequately stated an equal protection violation under a class-of-one theory. *Id.* at 565. The village's actions there involved government "regulation." *Engquist*, 553 U.S. at 596–97, 602 (construing *Olech*). By contrast, the City's enforcement of the Minimum Standards policy here has little to do with its role as regulator. The City's power to enforce any requirements under the policy flowed from its role as airport sponsor and owner of the airport.

In sum, plaintiff's theory asks us to hold that the terms of a lease or other commercial contract with a state or local government are subject to constitutional review by a federal court and that the government must enforce strict compliance in all of its contracts with competitors. That reasoning, as plaintiff describes it, would demand that plaintiff have a say in its competitor's contracts and their enforcement. The consequences of this logic would be unworkable, turning routine

contractual disputes into federal cases even if the parties to the contract itself could work out their differences by agreement. That is not required as a matter of constitutional law.[1]

In so holding, we do not suggest that every discretionary decision involving government contracting is beyond the reach of an equal protection claim. See *Engquist*, 553 U.S. at 605 (noting that Equal Protection Clause can still be "implicated when the government makes class-based decisions in the [public] employment context"). This case presents a narrow situation, and we provide a narrow answer, recognizing under *Engquist* that an "appropriate limiting principle must be tailored to the type of government action at issue." *Geinosky*, 675 F.3d at 747. When a company complains about the terms of its lease or contract, or about its competitor's treatment under a similar contract—without any class-based allegations—the company cannot seek recourse through a class-of-one claim under the Equal Protection Clause.

III. *Breach of Contract*

We turn next to plaintiff's second claim on appeal for breach of contract. Plaintiff contends that the City breached its lease with plaintiff by violating the Minimum Standards policy and grant assurances. In particular, plaintiff believes that the policy and relevant grant assurances were

---

[1] In support of its position, plaintiff cites *Gary Jet Center Inc. v. Gary/Chicago Int'l Airport Auth.*, No. 13-cv-453, 2014 WL 1329412 (N.D. Ind. Apr. 2, 2014). In that case, the district court denied a motion to dismiss an equal protection claim based on a class-of-one theory brought by a fixed-base operator against an airport authority for selectively enforcing regulations. *Id.* at *2. At that stage of the case, however, the *Gary Jet Center* court had not analyzed whether the class-of-one theory was available in the first place, let alone considered the reasoning of *Engquist*.

incorporated in its lease, so that if the City violated either or did not insist on strict performance by plaintiff's competitor, the City was also violating plaintiff's lease. The district court concluded that the Minimum Standards policy and relevant grant assurance were not expressly incorporated into plaintiff's lease. *Joliet Avionics*, 2024 WL 4753669, at *10–12. Plaintiff advances a different theory on appeal: Even if the Minimum Standards policy and grant assurance were not expressly incorporated, contract law incorporates all laws existing at the time of contract, so plaintiff is permitted to seek a private contractual remedy. We reject this theory.

Illinois law recognizes, and we have often said, that "as a general principle of contract law, statutes and laws in existence at the time a contract is executed are considered part of the contract. It is presumed that parties contract with knowledge of the existing law." *In re Doctors Hospital of Hyde Park, Inc.*, 337 F.3d 951, 959 (7th Cir. 2003), quoting *Braye v. Archer-Daniels-Midland Co.*, 175 Ill. 2d 201, 217, 676 N.E.2d 1295, 1303 (1997); see also *Von Hoffman v. City of Quincy*, 71 U.S. 535, 550 (1867) ("It is also settled that the laws which subsist at the time and place of the making of a contract, and where it is to be performed, enter into and form a part of it, as if they were expressly referred to or incorporated in its terms."). We refer to this doctrine here as the implied incorporation doctrine.

As courts and commentators have recognized, the implied incorporation doctrine is easy to repeat but hard to put into practice. See generally Steven W. Feldman, *Statutes and Rules of Law as Implied Contract Terms: The Divergent Approaches and a Proposed Solution*, 19 U. Pa. J. Bus. L. 809 (2017) (summarizing case law and explaining doctrine's internal contradictions);

see also *General Motors Corp. v. Romein*, 503 U.S. 181, 189 (1992) (explaining that "it is somewhat misleading to characterize laws affecting the enforceability of contracts as 'incorporated terms'"), citing 3 A. Corbin, Contracts § 551, pp. 199–200 (1960); *Doctors Hospital*, 337 F.3d at 959 (Illinois law; noting that the principle is a "commonplace judicial remark[]" but "artificial").

This doctrine may sometimes be used as a sword, as a basis for affirmative relief. When a plaintiff tries to do so, as here, we find useful guidance in the Illinois Supreme Court's decision in *Schiro v. W. E. Gould & Co.*, 18 Ill. 2d 538, 165 N.E.2d 286 (1960). There, a purchaser of a new building sued vendors for breach of contract when the new building did not come with the proper drainage and sewage system, as required by city code. *Id.* at 540–41, 165 N.E.2d at 288–89. The trial court dismissed the case, in part because the contract did not expressly incorporate those requirements. The Illinois Supreme Court reversed. Even if the contract itself did not explicitly contain those requirements, the court reasoned, it had implicitly incorporated the city code's building requirements. *Id.* at 545, 165 N.E.2d at 290–91.

Our decision in *Merrill Tenant Council v. U.S. Dep't of Housing & Urban Development*, 638 F.2d 1086 (7th Cir. 1981), in which we applied Illinois law, is also instructive. In that case, apartment tenants sued the Department of Housing and Urban Development for failing to pay interest on their security deposits, as Illinois law required. The tenant-plaintiffs sued in contract on the theory that the relevant Illinois statutes were incorporated as implied terms. *Id.* at 1089–90. We held that the plaintiffs could sue in contract on that ground and reversed the district court's dismissal. *Id.*

Plaintiff's theory here, however, threatens to go far beyond those typical cases of the implied incorporation doctrine. Plaintiff seeks to enforce the City's obligations under the relevant grant assurance and to recover damages for the City's purported violation. But the doctrine ordinarily applies to "existing laws, statutes and ordinances," which the grant assurance is not. See *S & D Service, Inc. v. 915-925 W. Schubert Condominium Ass'n*, 132 Ill. App. 3d 1019, 1023, 478 N.E.2d 478, 483 (1985); 11 Williston on Contracts § 30:19 (4th ed. May 2026 update) (collecting cases; listing the doctrine's applications to "constitutional provisions, interstate compacts, statutes, ordinances, and regulations") (footnotes omitted). The grant assurance is an agreement between the Federal Aviation Administration and an airport sponsor (here, the City) that arises upon the sponsor's acceptance of federal funding. It is a contract; it is not itself "a provision of law." See *Reed v. Norfolk Southern Railway Co.*, 740 F.3d 420, 423 n.1 (7th Cir. 2014); see also *Norfolk & Western Railway Co. v. American Train Dispatchers' Ass'n*, 499 U.S. 117, 130 (1991) ("A contract has no legal force apart from the law that acknowledges its binding character.").

The problem with treating the Minimum Standards policy as law—in particular, the provisions that plaintiff cites—is more subtle. Recall that the policy governs the airport tenants by providing baseline requirements for businesses operating at the airport. It does not prescribe terms for the City itself to obey. Plaintiff, however, points to language in the policy that declares that it is the City's "intent and duty … to encourage and promote free enterprise and the development of the airport" and that it is the City's "responsibility … to protect its tenants from unreasonable or unfair competition." Plaintiff seems to believe either that this language in the policy

imposes an obligation on the City or that, even if it does not, its incorporation into plaintiff's lease transformed this language into mandatory language. As to the first theory, the cited language is vague. At best, it is aspirational and does not have any legal force on its own. Cf. *FS Credit Opportunities Corp. v. Saba Capital Master Fund, Ltd.*, 608 U.S. —, —, 146 S. Ct. 1546, 1553 (2026) (when determining whether a federal statute creates a private right of action, courts must examine whether the statute uses "'rights-creating language' aimed at protecting 'a particular class of persons'"), quoting *Alexander v. Sandoval*, 532 U.S. 275, 288–89 (2001).

To understand the problem with the second theory, note that we have explained that the doctrine is useful, in part, as an "economizing measure." *Selcke v. New England Insurance Co.*, 995 F.2d 688, 690 (7th Cir. 1993); see also Feldman, supra, 19 U. Pa. J. Bus. L. at 828–33 (noting pitfalls of this justification). Parties do not need to write down every obligation or requirement they wish to enforce. Time would be wasted, and contracts would be far too long. See *Selcke*, 995 F.2d at 690. This doctrine works because we presume that every person knows the law and therefore would understand all the terms (express or implied) to which she agrees. *Braye*, 175 Ill. 2d at 217, 676 N.E.2d at 1303. That is how this doctrine does not make a hash of the "meeting of minds" (or manifestation of assent) requirement for every contract. See *Doctors Hospital*, 337 F.3d at 959 ("The presumption is artificial."); see also 2 Williston on Contracts § 6:1 (4th ed. May 2026 update) ("[I]t takes two to make a bargain."); Restatement (Second) of Contracts § 3 ("An agreement is a manifestation of mutual assent on the part of two or more persons.").

But when a person has no reason to believe that certain language imposes an obligation or requirement, it would make no sense for the language to be incorporated in a contract. Plaintiff's theory, though, would have us enforce either documents that are not the "law" as understood in the implied incorporation doctrine (the grant assurance) or language that does not suggest any concrete commitment (the vague and aspirational provisions of the Minimum Standards policy). See *General Motors*, 503 U.S. at 189 ("[W]e have not held that all state regulations are implied terms of every contract entered into while they are effective, especially when the regulations themselves cannot be fairly interpreted to require such incorporation.").

Plaintiff relies on common formulations of the doctrine—for example, that statutes and laws "in existence at the time a contract is executed are considered a part of the contract"—as proof that its theory is the natural consequence of the doctrine. See *S&D Service*, 132 Ill. App. 3d at 1023, 478 N.E.2d at 483. Its reading of the case law is an extremely literal one, and it underscores the problem with taking "commonplace judicial remarks" as all-encompassing. See *Doctors Hospital*, 337 F.3d at 959. Opinion language does not always reflect fully the underlying principle.

One last point. The fact that the City previously brought a breach of contract claim against Lumanair for not abiding by the Minimum Standards policy is of no matter. Unlike plaintiff's theory, the relevant lease between the City and Lumanair expressly requires *Lumanair* to abide by at least some of the policy's specific requirements. In other words, those requirements were expressly incorporated in that contract. See *188 LLC v. Trinity Industries, Inc.*, 300 F.3d 730, 736 (7th Cir. 2002)

No. 25-1483                                                    19

(Illinois law; "a document is incorporated by reference into the parties' contract only if the parties intended its incorporation"). The requirements in this situation, as we have explained, were not.

The judgment of the district court is therefore AFFIRMED.